BOYLE (JENKINS v.). See Case No. 7,262.

BOYNTON, In re. See Cases Nos. 8,042–8,044.

———

## Case No. 1,760.

### BOYREAU v. CAMPBELL et al.

[1 McAll. 119.][1]

Circuit Court, D. California. July Term, 1856.[2]

EJECTMENT—TITLE TO SUPPORT—DEFENSES—TRESPASS—WHAT AMOUNTS TO—ADVERSE POSSESSION—CHARACTER OF POSSESSION.

1. Where defendants in ejectment show no title, they cannot depend upon the invalidity of the documentary title of the plaintiff, accompanied by possession.

[See Preston v. Bowmar, 6 Wheat. (19 U. S.) 580; Christy v. Scott, 14 How. (55 U. S.) 282; Turner v. Aldridge, Case No. 14,249.]

2. Defendants in entering upon the premises in dispute, whether regarded as "vacant" or "public land," or as land acquired by the government of the United States under a foreign grant, are to be deemed trespassers.

3. Defendants cannot, in a general answer, avail of an objection to the jurisdiction of the court on the ground that the title of plaintiff is merely colorable.

4. "Rodeo boundaries," under the customs and acknowledged usages which prevailed in California, constituted as notorious evidence of the possession of land as the cultivation or fencing in an old, settled country.

[See note at end of case.]

At law. This was an action of ejectment [by Clement Boyreau against Robert Campbell and others], and, a jury having been waived by the parties, was submitted to the court on the law and facts, with a reservation to the parties of the right to except to the rulings of the court in relation to the admission of testimony, as well as to the decisions made upon the law of the case on its merits.

Saunders & Hepburn, for plaintiff.

A. M. Crane and Thompson Campbell, for defendants.

McALLISTER, Circuit Judge. The grant under which by mesne conveyances plaintiff claimed, was alleged to have been lost; and plaintiff called Juan B. Alvarado, who was governor at the time the grant was issued, and who testified that the expediente in an application for land, consists of the petition of the applicant, the orders for information, the decree of concession, and a draft of the title-paper issued to the party. These documents are collected together and preserved in the archives, constituting what is termed the expediente. He further stated, that it depended entirely on the secretary whether he made out the title first and then copied it, or made the draft first, and then drew up the title to be signed. It was part of the mechanism of his office—that in his time it was customary to give a verbal order to the secretary to write out the concessions, and that the secretary sometimes (as in this case) made out a final title without an order of concession signed by the governor. The witness was unable to recollect an instance where the archives showed a decree of concession on a separate piece of paper, where no information was asked for, nor did he know whether any of the expedientes contained more than one draft of the title. He did not remember any case where the governor made any alteration or correction of the title as drawn up. He also stated that he recollected various instances where the concession was presented unsigned to the departmental assembly. In such cases they made no difficulty, provided it was archived. Sometimes the secretary of the assembly, or that of the governor, observed it and had it signed, to regularize the proceedings. He further stated, that it was usual to deliver the title to the petitioner, subject to the approval of the departmental assembly, and afterwards to send the expediente with a draft of the title to the assembly, for their approval; and that he never knew a case where the draft of the title was put in the expediente without the original's having been first delivered to the party, nor where, after the draft was made, the governor refused to sign and the grant was stopped. The witness then, on being shown the expediente, stated that he knew the first paper; that it was the original petition of Estudillo, and was in his handwriting, which he knew. The next paper, the decree of concession, he proved to be in the handwriting of Francisco Arce, at that time first officer of the secretario. The third paper he also stated to have been written by Arce. The writing on the the desino or plan, he stated to be that of Fernandez, an ancient alcalde of San Jose. He added, that he recognized all these papers as the original documents on which the title

---

[1] [Reported by Cutler McAllister, Esq.]

[2] [Affirmed in Campbell v. Boyreau, 21 How. (62 U. S.) 223.]

issued; and that the plan was not presented by the petitioner, as he was already in the possession of the land, but was made by the prefecture in pursuance of his (witness's) orders, and as a means of obtaining information, and to enable him to decide a dispute between Estudillo and Guliellmo Castro as to boundaries. That, on receiving the map, he called the parties together; but being unable to bring them to an amicable settlement, he sent for Jose Castro, and instructed him to endeavor to settle the dispute, and in case of failure, to report what was just to be done. That Jose Castro, being unable to effect the settlement, gave him a map with a line drawn on it, as that, he thought it just to be established. That the witness accepted this line, and ordered the grant to issue bounded on the east by the Deramadores de Aguas on the side of the high hills, on the west by the bay, on the south by the Arroyo de San Lorenzo, and on the north by the Arroyo de San Leandro. He also stated that the grant contained the usual conditions, and was for a league, more or less, and that there was a special condition that the Indians should not be molested. A paper was then shown to the witness, which he identified as the official note sent to the secretary of the governor when the latter asked for the first plan. He also identified and proved the report of Jose Castro (a document produced from the archives), and stated the marginal order to be in his (witness') handwriting.

R. A. Thompson, one of the late board of land commissioners, swore that he had examined some three hundred or four hundred expedientes. That they did not all contain copies or drafts of the grants. That they frequently varied from the grants delivered to the parties, but, in a majority of cases, not materially; but in some cases they differed on substantial points. That the proceedings, as shown in the expediente, were regarded by the board as affording proof of the existence of a grant. That he never saw any book where the titles were recorded. That one has been mentioned, but that it was not kept up except in the earlier times.

John Saunders, deposed that his professional firm had been employed to prosecute the claim under the Estudillo grant. That with a view to prosecute the same he had received a Spanish paper, signed by Juan B. Alvarado as governor, and Manuel Jimeno as secretary. It was a grant to Joaquin Estudillo, for the ranch of "San Leandro."

Governor Alvarado was recalled, and the original expediente of Estudillo from the archives, was handed to him, and asked if he could identify it, and then testify from his own recollection to the contents of the original grant delivered to the party. To this the defendant's counsel objected, on the grounds: 1. Because the draft was not made by himself. 2. It was not compared by him with the original. 3. Because it is not a record, nor a copy of the original au-

thorized by law to be taken. 4. Because not the best evidence in whose handwriting the grant is. The objections were overruled. Witness Alvarado, on looking at the expediente identified it and recollects it distinctly, and the expediente was admitted as evidence.

R. C. Hopkins was sworn. Stated he was a clerk in surveyor's office; that a book of titles is to be found among the archives, for the years 1834, 1835, 1836. Since that time no such book has been kept or found. This witness identified the expediente as one of the archives.

In order to fortify the testimony in relation to the existence of the original grant, S. G. Tenant was sworn on behalf of plaintiff. He stated that he had seen the original grant in the possession of John B. Ward, about a month after the death of Estudillo, at San Leandro, at the house of the widow of Estudillo; it was signed by Governor Alvarado, whose handwriting was known to witness, and, as witness believes, by Manuel Jimeno. The grant was dated in 1842. Witness was acquainted with the Spanish language.

Jose Berreyesa, another witness, stated that he had seen the original grant to Estudillo in 1843 or 1844, and that the signatures of Alvarado and Jimeno were genuine; that the grant was for the "San Leandro Ranch," for one league square; and witness gave the boundaries of the ranch.

John B. Ward, a witness for plaintiff, was called to prove the loss of the original deed. He was objected to by defendant's counsel as incompetent, having married one of the daughters and heirs of Estudillo. He was admitted by the court to prove the loss. He stated that he had received a grant signed by Alvarado and Jimeno officially, from the professional firm of Saunders & Hepburn, attorneys at law, on 2d September, 1853, at their office in San Francisco, at one o'clock, p. m. That Hepburn & Saunders had been employed professionally by the heirs of Estudillo, to prosecute their claim before the land commissioners; that having been advised by Messrs. Saunders & Hepburn to engage additionally the services of Judge Thornton, he took the grant to carry it to that gentleman's office; on his way there he heard of a squatter difficulty on the opposite side of the bay, in the vicinity of San Leandro, in which a man was killed; that witness hastened across the ferry; that the weather was bad, and witness undertook to pilot the boat; that she was detained all night on the water; that next morning the grant was gone; thinks it must have dropped from his person during the night; he had searched for it in vain, and has never been able to find it. Cross-examined.—Witness had seen the document before he received it from Saunders & Hepburn; it was signed by Alvarado and Jimeno; it had been exhibited to witness by Si-

gnora Estudillo, as her title; it was the same document received by witness from Saunders & Hepburn.

The defendants moved the court to exclude all evidence, oral and documentary, which had been given to prove the existence, loss, or contents of the original grant, on the grounds: 1. Because the grant itself, if produced, would not prove that a legal title had passed to Joaquin Estudillo. 2. Because the grant had not been approved by the departmental assembly. 3. Because there was no official segregation of the land from lands of a like character. 4. Because the title is merely equitable. 5. Because the best evidence of the former existence of the grant has not been produced, the law showing that a record was required to be kept. This motion was overruled; reserving it for the final decision of the court, after all the testimony should have been delivered.

We proceed now to dispose of it. A further examination satisfies us that there was sufficient testimony offered to authorize the introduction of secondary evidence to establish the existence, contents, and loss, of the original grant, and that the best evidence of which the nature of the case permitted, was given for that purpose. As to the objection that the title of the plaintiff is merely equitable because there had been no previous approbation of his grant by the assembly, it is important in considering it to look to the relative situation of the parties. Joaquin Estudillo, under whom plaintiff claims, went into possession of the land in controversy in 1837, which he retained until 1842, when he obtained his grant. From that time he continued to reside upon it until his death in 1852, since which time his widow and family have been in occupation of it. During this long possession he has had a large stock of cattle on the place, and cultivated it to the extent of some three hundred acres in different parts. Such is the title of the plaintiff.

The defendants have given no evidence of title whatever, unless the position they assume be correct. It is, that the land in controversy is part of the public domain, to which they have pre-emption rights. This position cannot be deemed as giving title. The act of 3d March, 1853, entitled "An act to provide for the survey of public lands in California, the granting of pre-emption rights, and for other purposes," expressly exempts from pre-emption this very land, claimed as it is "under a foreign grant or title:" 10 Stat. 246. The land in dispute, if public land, as contended for by defendants, is so because it was acquired by the United States government by treaty from Mexico. Now, the act of congress of 3d March, 1807, entitled "An act to prevent settlements being made of lands ceded to the United States, until authorized by law," expressly inhibits the entry upon, taking possession of, or settlement on any lands ceded or secured to the United States, by any foreign nation, which lands have not been previously sold or leased by the United States, or the claim to which land has not been previously recognized and confirmed to the person entering, &c., by the United States. 2 Stat. 445. In the case at bar, the defendants pretend to no title whatever from the United States, and we have seen by the act of congress of 3d March, 1853, in special reference to lands in California, the land in controversy, claimed as it is, under the grant of a foreign government, is exempted from pre-emption rights. The defendants are therefore to be viewed as mere occupants of the premises, without pretense of title. As such occupants, they rest the defense of their possession upon the invalidity of the title of the plaintiff. Under this view of the case the court will make every intendment which the law allows, in favor of the plaintiff's title. The ground on which it is assailed is, that the grant under which plaintiff claims, never having received the approval of the departmental assembly, conveyed only an inchoate title. Whether, in fact, such approval was obtained, is matter of evidence. Now, in this case, the grant in terms recites that it is given by virtue of the said grant, and the approbation the party had received from the most excellent departmental assembly. Now, if this recital in the grant be conclusive, there can be no doubt that the fee passed by the grant. If not conclusive, it is prima facie evidence, which must prevail in the absence of all other testimony. The cotemporaneous date of the concession and the grant is relied on by the defendants; but this cannot be held as disproving the positive statement in the grant. Non constat that the assembly was not in session at the time, or an approval of the contemplated grant had not been obtained at some previous session by the governor. The grant, under any view taken of it, comes within the definition of a colorable title, as given by the supreme court of the United States, who say that "color of title is that which, in appearance is title, but which in reality is no title." [Wright v. Mattison], 18 How. [59 U. S.] 56. The grant professes and has on its face all the requisites of a complete legal title, and constitutes at all events colorable title; which, accompanied by possession, will maintain an action against mere trespassers.

In the course of the trial the defendants called the plaintiff, Clement Boyreau, who deposed that he did not know Robert Grimes Davis except in connection with this case. On the 14th November, 1855, at the request of a friend he accepted the transfer of the undivided half of 1-18 of the Rancho de San Leandro, for the consideration of $8,000. He accepted the transfer to oblige a friend; the deed was not delivered to him; it was deposited with his attorneys, Saunders & Hepburn; he had no interest in this pur-

chase himself; a friend requested him to permit the title to be transferred to him, and his attorneys informed him they held the title for him; that it was in their office subject to his disposition; he had never done any act limiting or impairing his title; did not know whether the consideration had been paid by any one; he held the title for a Mr. Touchard; did not give orders personally for the institution of this suit.

The deed to the plaintiff had been previously given in evidence. The defendants now moved to exclude it on the grounds: 1. Because it was merely colorable, and executed solely to give jurisdiction to this court. 2. Because there was no sufficient proof of the delivery of the deed. The objection was overruled, and, the court thinks, correctly. It was contended that a deed merely colorable passed no title to the plaintiff. But we are of opinion that by this deed the legal title was vested in him, and that the ground of objection is, that he is not the real but merely nominal party to the controversy, the real party being a citizen of this state. Had this objection been taken by plea in abatement, it would have been sustained. But the defendants having omitted to interpose it, cannot now avail themselves of the defense. Such has been the ruling of the supreme court, where the citizenship of the parties to the record has been sought to be shown on a trial of the merits, and the same rule applies where a similar fact is attempted to be proved with regard to the real party to the controversy.

The expediente of one William Castro was next introduced by the plaintiff. It was proved to have come from, and to be a part of the Mexican archives in the surveyor-general's office, and contained a copy grant, and desino of a ranch directly bounding on the San Leandro ranch, and was offered to show the line recognized by the Mexican authorities at the time, as the line which on one side bounded the ranch of San Leandro. It was objected to and the objection overruled, as the court thinks, correctly.

The plaintiff then introduced several witnesses to establish what are called the rodeo boundaries of the San Leandro. This was objected to, and the objection overruled. The question as to these boundaries will be discussed hereafter. The genuineness of the grant was assailed by defendants, by the introduction of the testimony of one Marcus Esquilla; who deposed that in the spring of 1849, he had a conversation with the grantee, Estudillo, in which the latter showed witness the title-papers to the rancho, which were not signed, and the reason assigned by Estudillo for their not having been signed was, that the government would not make a grant until he, Estudillo, had effected some settlement with the Indians; that the said papers formed what is called an expediente, and included the form of a grant, which was not signed; that said Estudillo told witness

these were all his title-papers. The conversation is alleged to have taken place in the spring of 1849. To discredit this testimony, a witness (Felipe Fierro) was sworn, who deposed that he was well acquainted with Esquilla, and corresponded with him about his business until his death, and subsequently with his brother; that in May, 1850, both Estudillo and Esquilla happening to be in the store of witness, the latter asked, "Who (meaning Estudillo) that gentleman was?" Witness did not introduce the parties. It is evident that if Esquilla did not know Estudillo in May, 1850, he could not have had the conversation with him he swears to, in the preceding year. But still, it is better to view the testimony of the discrediting witness as erroneous as to the time, and consider the fact of such conversation as established by the evidence of Esquilla. Still, the recollection of a witness as to spoken words of several years standing are to be received with caution, when the testimony which has been given of the original grant is considered. The witness may be prepared to swear that a party had said the papers exhibited were all the papers in his possession; still, there may have been misapprehension as to what was said, or in fact all the papers may not have been exhibited.

Again, the reason which the witness assigns as the one given by Estudillo for the non-signature of the grant, to wit, that he had omitted to settle with the Indians, is not in unison with the practice of making grants subject to the Indian rights. It is further contradicted by the fact in this case, that the grant is made to exclude the possessions of the Indians. A previous settlement, therefore, in relation to them, was not indispensably necessary to the issue of the grant. To divest title on such testimony, where the counter evidence is as strong as it is in this case, would be to decide contrary to the weight of evidence. Governor Alvarado swears he issued the grant. The expediente from the archives proclaims, and the long possession of the grantee under it tends to prove, its genuineness. Jose Berreyesa stated that he had seen the original grant in 1843, and proves the signatures of both Alvarado and Jimeno. John B. Ward swears that he had seen the grant, and also proves the signature of Alvarado; and lastly, John Saunders swears to have been in possession of the grant. In view of all the testimony, and acting as jurors, we find that the signatures to the grant have been established.

Having stated the rulings of the court and the objections of counsel thereto, during the trial, we proceed to consider the merits of the case, and the evidence which establishes the possession of plaintiff, and its extent. It is ascertained that long previously to the intrusion of the defendants, the grantee and those who claimed under him had been in possession of the tract sued for; that from

1837 to 1842 the grantee had resided on the rancho known as the San Leandro; he had built a house upon it, resided thereon, and stocked it with cattle; his possession previously to the issue of the grant had not only been recognized, but actually authorized by the Mexican government; and in 1842, when he obtained his grant, the general limits of his land were notorious. It is proved by numerous witnesses that both before and after the grant, the tract he occupied, and was recognized- as possessing, was the San Leandro rancho, of which the notorious and undisputed boundaries were the two arroyos of the San Leandro and San Lorenzo, the hills, and the bay, and to have been with his family as notoriously and completely in the occupancy of it as, according to the customs of the country, any Californian could be. He occupied it until his death, in 1852, and stocked it with cattle marked with his brand. No one, save a few Indians, lived on or occupied any portion of his land; and over the whole tract he asserted all those rights which at that time could have been asserted by the proprietor of land in California. He cultivated portions of it, in the neighborhood of his house, and near the San Leandro creek.

In 1842, the witness Valencia, took, by permission of Estudillo, her father-in-law, cattle to pasture on the rancho, which were kept on the tract between the two creeks; and, with the consent of Estudillo, her husband cultivated a portion of the land on the San Lorenzo creek. From the whole tract the cattle of Estudillo were gathered; and on the stock running within its limits he exercised all the rights of ownership. For the purpose of showing the nature and extent of his possession, the plaintiff introduced testimony to establish what are termed the "rodeo boundaries" of his ranch. The nature of these requires explanation. The extensive tracts of land belonging to the former inhabitants of this country were never separated from each other by inclosures. But a small portion of the large extent owned by the rancheros was put under cultivation; and their herds of horses and cattle, in which their principal wealth consisted, roamed at large over the extensive tracts conceded to them by the government. At a certain season of each year, however, the cattle were collected from the limits of the rancho, at a place, usually near its center, called the "rodeo" ground. Here the young cattle were branded with the mark of the owner, and the whole herd were confined for a short period, to habituate them to the spot, and insure their return at the ensuing season. The proof of ownership furnished by the brand on the animals, seems to have been universally respected; and wherever the cattle might wander, they could be reclaimed by the owner. The young, unbranded cattle, which still followed the mother, were recognized as belonging to the owner of the latter;

but there were many which had no mark, and having ceased to follow the mother, mingled indiscriminately with the herd. These were called orijanas, and by the custom of the country were deemed to belong to the owner of the ranch on which they were found. In driving, therefore, the cattle to the rodeo, the vaqueros were required to observe scrupulously the boundaries of the ranch, for only the orijanas found within them were considered as belonging to the proprietor giving the rodeo. That these boundaries were generally respected, is proved by several witnesses. To drive cattle, on the occasion of a rodeo, from a neighbor's land being considered, as stated by one of them, "worse than squatting." The observance of the boundaries was not secured by the customs of the country alone; for the neighboring rancheros were always invited to be present when a rodeo was to be given, and attended on horseback to observe the limits from which the cattle were driven, and to reclaim any of their own that might have mingled with the herd. The rodeo boundaries of a ranch, or the limits from within which all the cattle upon it were collected together, thus became generally known; and when, as in the case at bar, they have been recognized and acted upon for a long series of years, they afford the best, if not the only evidence of the limits of an actual occupation, which the habits of the people permitted them to furnish. To exact of proprietors using their lands for purposes so different from those to which we apply them, evidence of actual occupation by inclosures or cultivation of the soil, would be to demand what could never be afforded. There is surely no magic in a fence. In a country where land is owned in small parcels, and usually inclosed, such inclosure affords unmistakable evidence of appropriation and occupancy. When, therefore a right is claimed to have been acquired by an adverse possession without color of written title, the party is restricted to the land the exclusive right to which he has asserted notoriously by inclosing or cultivating it. The fence or cultivation, of themselves, confer no title. They only afford evidence of the intention to assert a right to the land included within them. The same evidence is afforded by an entry on and occupation of a part of a tract of land under color of a written title to the whole. For in that case, a party is deemed to be in possession up to the limits of his deed. But other acts equally significant of the parties' intention (being the strongest that circumstances admit), may have the same effect. Where, by the customs of a country, acts of ownership have been exercised, and the land within certain limits recognized as claimed by those acts. Where the party has used and possessed the land in the only way in which an owner would use and possess it, and as none but an owner would use it; where the limits of the land

to which he thus asserts his rights are notorious, and have been recognized for a series of years, and undisputed,—it seems to us that such facts furnish evidence of a possession as satisfactory as if, according to the customs of an old and settled country, a fence had been built about it; and sufficient to enable a party to maintain his right to it in a court of justice, against intruders who have entered not only without pretense of title, but in open violation of law. In this case, the rodeo boundaries are clearly shown to have been established and recognized by the neighbors of Estudillo, from a period long anterior to the acquisition by the United States of this country. By the ascertainment of these boundaries, the plaintiff has established the actual extent of his actual possession. To fortify the evidence of possession, testimony was adduced to prove that in 1853, shortly after the death of Estudillo, his representatives, who continued to reside on the land, rented a portion of it, about three hundred acres, to one Joseph Demont, who entered into possession. This land was inclosed by a fence, and includes the land upon which one of the defendants, and a portion of the land upon which another, have "settled."

In the same year, and after the encroachments of American settlers had taught them the virtue of a fence, the representatives of Estudillo employed one J. C. Pelton, who, under their direction fenced in several thousand acres, and erected on the land some six or seven houses. The fences and houses have been burnt by accidental fire; and a portion of the land is now occupied by some of the defendants to this action. Recapitulating, then, the evidence as to possession, we find that Estudillo, the grantee, went into possession in 1837. In 1839 he obtained a provisional license to continue in possession, from the governor. That in 1842 he obtained a grant, from the date of which he has occupied and claimed the ranch of San Leandro, with well-known boundaries. That he built a house upon, and cultivated portions of the land. That he had his fields, corrals, and rodeos. That his cattle roamed over it, bearing his brand, and were herded upon it by his vaqueros. That at stated periods, according to the recognized customs of the country, his cattle were driven together from the external limits of the ranch; and that in every way in which a Californian could use land, he exercised acts of ownership over it. That the ranch was recognized as being in his possession; and so notorious was the fact, that an old resident of the country swears, "that it was so fixed in his mind that he was the owner that he took it for granted." After the death of Estudillo, we find his representatives residing upon and claiming the whole of it; and, though intrusions soon commenced, in the hope of retaining it renting a portion of it, and surrounding with fences several thousand acres, portions of which are now "settled" upon as "vacant public lands."

If the foregoing facts do not constitute possession, then no occupancy can be established by a California ranchero; for nothing short of actual inclosure or cultivation would suffice. We consider the evidence sufficient to establish a prior and peaceable possession, and its extent, so as to authorize the plaintiff to maintain this action. The rodeo boundaries have been established so clearly by the testimony, that the plaintiff might have recovered to the extent of them. But he has himself introduced a written title, and to that we must look. The grant calls for the boundaries of the ranch,—the arroyos of San Leandro and San Lorenzo on the north and south; on the west, the bay; and on the east, the derramadores, or springs of water, and from thence a line, southerly, drawn to the San Lorenzo so as to exclude the possessions of the Indians. These limits on the east are considerably within the line of the crest of hills which, according to the testimony, forms the eastern rodeo boundary. But the plaintiff producing this grant, must be restricted to the boundaries thereon designated. At the time of the grant, one or two Indian families inhabited an adobe house on the land at the base of the eastern hills, and had some cultivation near the house, and at a bend of the San Lorenzo, at a point called "Paso Viejo." It is not easy to ascertain what at that time was the precise extent of the Indian possessions. It is practicable, however, to adopt a line which will exclude the land which, under any reasonable view of the evidence, they could have occupied. With the exception of the uncertainty which attends the precise location of this eastern line, the boundaries of the ranch have been ascertained by proof of what we consider as complete possession as could be furnished by any California ranchero. The quantity of land granted to Estudillo was one league, a little more or less. It appears from the testimony, that the actual quantity exceeds that amount but a fraction; and may be deemed to be covered by the words "more or less," inserted in the grant. The complete possession of all the land to the extent of three of the boundaries, and beyond the fourth, is established by proofs. It remains to inquire, after restricting the last-mentioned line to that called for in the grant, which of the defendants are intruders upon it. A stipulation by the parties has been filed, in which it is agreed that the defendants respectively occupy the several tracts designated by their names on a map marked A, to which reference is made. On inspecting this map, we find some of the defendants in the occupancy of land which at the time of the grant was probably in the possession of the Indians. We shall therefore direct a verdict of "Not guilty" against them. Against those who are clearly in possession of land not excluded by the grant by reason of the

Indian possessions, a verdict of "Guilty" must be rendered. We have fixed the line according to the limits as ascertained by the testimony in this case, leaving its precise location to be established hereafter as between the government and the parties interested in its precise location.

The attorneys of the plaintiff will draw the form of a verdict for signature in favor of William Campbell and William Carhart, and against all the other defendants, who, by the stipulation entered into, it is agreed are in possession of the premises.

After the opinion of the court had been read, the counsel for the defendants moved the court to reconsider so much thereof as related to the eastern boundary line of the ranch, whereupon the court, after argument of counsel, took the same under advisement, and afterwards delivered the following, affirming the former opinion of the court:

In this case we have been asked by defendant's counsel to reconsider our views in relation to the location of the eastern line of the San Leandro ranch. The line, as fixed by us, excludes two of the defendants and includes the others; and it is urged that a re-examination by the court may result in so giving the line as to exclude from the operation of the verdict an additional number of the defendants. We have carefully examined this question, and now give the result. We are free to confess that the precise location of the eastern line is not easy of accurate ascertainment. This arises from the difficulty of establishing with precision the exact extent of the Indian possessions at the time of the issue of the grant. The testimony on this point is conflicting; but after a careful review of it our conclusion is, that the possessions of the Indians were confined to the adobe house which they occupied, and its immediate vicinity, and to some cultivated spots of land near the bend of the San Lorenzo creek, at a point known as the "Paso Viejo." Numerous witnesses confine them to those points. One or two of the witnesses testify to a small cultivation almost due west from the springs, and about half a mile therefrom. But this is opposed by many witnesses, and is repudiated by the fact that to run the line so as to take in this isolated spot would be to so distort the line, as we consider it designated on the map, as almost to destroy its identity. The defendants' counsel, in his brief, relies on a line deposed to by one of the witnesses, Ignacius Peralta. That this line was not intended to separate the Indian possessions from the land of Estudillo is evident, because the witness tells us that he knew the ranch of Estudillo in 1840, 1841, 1842, and 1843, and that he knew no line dividing the land of Estudillo from that of the Indians, although the witness had lived for twelve years within two hundred varas of Estudil-

lo. The line which the witness deposes to is evidently a line known in the case as the "longitude line," which, with the "latitude line," were run by the functionary Fernandez for the information of Governor Alvarado. This line of longitude, denominated in the counsel's brief, the "Peralta line," is urged as the line delineated in the desino of Estudillo's expediente, and described in the grant. This line is designated in the grant, using the words into which the original has been rendered by the counsel, "a line on the east by the spillings of the springs that are near the house occupied by the Indians, and on the south by a line drawn from thence to the San Lorenzo so as to exclude the land occupied by the Indians which are located there." Assuming this translation to be correct, there are objections which oppose themselves to the location of this specific line.

1. To adopt it would be taking a part of two lines designated on the desino to form the boundary, viz.: the line of latitude to the springs, and thence leaving that line, to adopt the line of longitude from that point to the mouth of the San Lorenzo creek.

2. Such line must at the springs diverge to the west, and run to the mouth of said creek, instead of running to the creek as called for; this would be to repudiate the creek as a boundary, whereas the desino has written on it all along that creek these words, "Arroyo de San Lorenzo lindero con San Jose;" thus distinctly declaring the line of that creek to be the boundary between the ranch and San Jose.

3. This line would exclude a considerable portion of land intermediate the springs and the creek, which, confessedly, has never been in the possession of the Indians.

4. It is not probable that the grant would call for the creek parallel as it runs to the opposite creek of San Leandro, as the terminus of the line called for, instead of its mouth, if the latter was intended.

These are some of the difficulties which suggest that this longtitude line is not the one designated on the map. There are other considerations, growing out of the grant itself. To arrive at a correct translation of it, we have invoked the aid of competent, skillful, and disinterested persons. The defendants have rendered the words "por la parte del Sud," in the grant as meaning "on the south," equivalent for the southern boundary. Now, we understand these words in the connection in which they are used, to be translated differently; and, further, we consider that by the terms of the grant, the line to be run from the springs of water is to be a straight line. The grant, including the words "por la parte del Sud," calls for the boundary on the east,—the drawings (derramadores) of the springs in the lands occupied by the Indians settled there, from this point in a straight line towards the south, to the Arroyo de San Lorenzo, without including the land cultivated by the

Indians. By this description the line is delineated as a "straight line" from the starting point to the creek, deflecting only so far as to exclude the Indian possessions. Calling for a "straight line," it would seem that a direct one was intended, departing only from a direct line to the extent of excluding the Indian possessions. Now, the line of longtitude would, if adopted, traverse the greatest distance which at any point intervenes between the starting point and the creek, viz. its mouth.

Again, the line called for by the grant is to go south; and the longtitude line, if adopted, would run west from the derramadores to the mouth of the creek. We have seen that the map itself calls for the San Lorenzo as the boundary in terms, and by having in writing on its face along the creek, the words we have quoted. Again, in the report of Jose Castro to the governor, it is stated that the Mexican functionary Fernandez, had delineated two lines on the desino, one of longtitude and the other of latitude, leaving the selection to his excellency. By his marginal decree, the governor selects the line north and south as the line of W. Castro's land. This line, it is true, was selected some time prior to the grant to Estudillo; but it serves to show the understanding of the government as to the dividing line between the land granted and the adjoining land. This line is not only delineated on the map which accompanies the expediente of William Castro, but is found also on that of the expediente of Estudillo when he obtained the grant for the adjoining land. Governor Alvarado, who issued the grant, swears to the San Lorenzo as the southern boundary. Numerous witnesses depose to the same fact. Ignatius Peralta, one of the defendants' witnesses, states that for a long period he lived in the immediate vicinity of Estudillo, and that during that time the pasturage of Estudillo's cattle extended over the plain up to the San Lorenzo on the one side, and the San Leandro on the other. Durante Valencia, a witness, states that in 1842, with the permission of Estudillo, she cultivated lands on the bank of the San Lorenzo; and another witness, A. C. Smith, deposes that in 1851 Estudillo had forty acres in barley on the same creek. The occupancy of Estudillo up to the San Lorenzo, and its notoriety as the southern boundary, have been established by testimony. These facts, connected with what we consider the correct interpretation of the grant, confirms us in the conclusion that the line approximating to what is termed the adobe line, is the true line; and the most careful examination of the testimony and the language of the grant, have brought us to the conclusion that protection has been afforded to the former Indian possessions by fixing the line designated in the grant as the eastern boundary, by which all the defendants, save Campbell and Carhart, have been brought within the limits of the San Leandro ranch.

NOTE [from original report]. Affirmed [Campbell v. Boyreau,] 21 How. [62 U. S.] 223, on a collateral point. No decision given on the rulings of the court below, on the law and facts of the case.

[NOTE. Affirmed by the supreme court on error without expressing an opinion as to the facts or the law decided by the circuit court, on the ground that none of the questions, whether of fact or of law, decided by the court below, could be re-examined and revised upon the writ of error, for the reason that, by the established principles governing common-law proceedings, no question of law can be reviewed and re-examined in an appellate court upon writ of error, except only where it arises upon the process, pleadings, or judgment in the cause, unless the facts are found by a jury, or are admitted by the parties, upon a case stated in the nature of a special verdict stating the facts, and referring the questions of law to the court; that the finding of issues of fact by the court upon the evidence is altogether unknown to a common-law court, and cannot be recognized as a judicial act, such questions being exclusively within the province of the jury; and if, by agreement of parties, the questions of fact in dispute are submitted for a decision to the judge upon the evidence, he does not exercise judicial authority in deciding, but acts rather in the character of an arbitrator. Following Guild v. Frontin, 18 How. (59 U. S.) 135; Suydam v. Williamson, 20 How. (61 U. S.) 427; Kelsey v. Forsyth, 21 How. (62 U. S.) 85; Campbell v. Boyreau, 21 How. (62 U. S.) 223.

[By act of March 5, 1865, c. 86, § 4 (13 Stat. 501), the parties or their attorneys may waive a jury in a civil case by filing a stipulation to that effect with the clerk. The supreme court cannot, since the passage of this statute, consider the correctness of rulings at the trial of an action by the circuit court without a jury, unless the record shows a compliance with the statute. Flanders v. Tweed, 9 Wall. (76 U. S.) 425; Kearney v. Case, 12 Wall. (79 U. S.) 275; Gilman v. Illinois, etc., Tel. Co. v. 91 U. S. 603; Madison Co. v. Warren, 106 U. S. 622, 2 Sup. Ct. 86; Alexander Co. v. Kimball, 106 U. S. 623, 2 Sup. Ct. 86; Bond v. Dustin, 112 U. S. 604, 5 Sup. Ct. 296; Boogher v. New York Life Ins. Co., 103 U. S. 96; Hodges v. Easton, 106 U. S. 408, 1 Sup. Ct. 307.

[This act, however, has no application to the district court, and the rulings of that court can only be reviewed by the circuit court where the facts have been found by a jury or agreed on by the parties. Blair v. Allen, Case No. 1,483; U. S. v. 15 Hogsheads, Case No. 15,090; Wear v. Mayer, 6 Fed. 658; Town of Lyons v. Lyons Nat. Bank, 8 Fed. 369; Doty v. Jewett, 19 Fed. 337.]

BRACHEN (SNYDER v.). See Case No. 13,-153.

BRACHEO (DOUBLEDAY v.). See Case No. 4,018.